## SIERRA CLUB & others[1] *vs.* COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL MANAGEMENT & another.[2]

Suffolk. March 4, 2003. - July 14, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Massachusetts Environmental Policy Act. Department of Environmental Management. Environment,* Environmental impact report. *Administrative Law,* Findings, Judicial review, Standing.

This court concluded that the plaintiffs in a civil action to review the decision of the Secretary of the Executive Office of Environmental Affairs to issue a certificate approving an environmental impact report submitted by a developer for the expansion of skiing facilities within a State reservation had standing to challenge that certification, where the permit for a portion of the project effectively was issued when the commissioner of the Department of Environmental Management gave his approval to begin work on ski lifts; further, although no permit had been issued for work on ski trails, this court exercised its discretion to consider questions relating to the trail work, where those questions were fully litigated below and had been fully briefed on appeal, and where the defendants did not argue that that aspect was not ripe for review. [744-745]

The judge in a civil action incorrectly applied a "substantial evidence" standard when reviewing the findings of the commissioner of the Department of Environmental Management under G. L. c. 30, § 61, regarding the expansion of skiing facilities within a State reservation, where, because the commissioner's findings were more regulatory than adjudicatory in nature, the judge should have reviewed those findings under a rational basis standard. [745-749]

In a civil action challenging the findings of the commissioner of the Department of Environmental Management under G. L. c. 30, § 61, regarding the expansion of skiing facilities within a State reservation, the judge erred in concluding that the environmental impact report submitted by the developer failed to address the need for the proposed project, failed to address reasonable alternatives to the proposed new ski trails and widening of existing trails, and failed sufficiently to identify and analyze the impacts of the project on an old growth forest located within the reservation. [749-752]

[1]Watchdogs for an Environmentally Safe Town (WEST), Herbert Bingham, Donna M. Brownell, Therese Calvert, Beverly Camp, Edward Camp, Andre Gray Wolf Forest, Timothy Redloon Kelly, Stephen Kessler, Mary Marro, Anne Merriam, Emily Miller, Patty Miller, Sydney Patten, Joseph Reynolds, George Ross, Muriel Ross, and Mike Smith.

[2]Wachusett Mountain Associates, Inc.

In a civil action challenging the findings of the commissioner of the Department of Environmental Management (department) under G. L. c. 30, § 61, regarding the expansion of skiing facilities within a State reservation, the judge erred in concluding that the record did not support the findings confirming the need for new ski trails or the findings that all feasible measures had been taken to avoid or minimize environmental damage, and in concluding that construction of new trails and the widening of existing trails would violate the department's resource management and protection plan for the reservation and the department's Statewide policy regarding old growth forests. [752-757]

In a civil action challenging the findings of the commissioner of the Department of Environmental Management (department) under G. L. c. 30, § 61, regarding the expansion of skiing facilities within a State reservation, the judge correctly ruled that the commissioner had extensive authority to make decisions with regard to the development and improvement of State reservations, subject to the requirement that the commissioner's actions be in accordance with the programs and policies of the department, as promulgated by the board of environmental management. [757-758]

CIVIL ACTION commenced in the Superior Court Department on August 27, 1999.

The case was heard by *Robert J. Kane*, J., on motions for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Steven E. Thomas*, Assistant Attorney General, for Commissioner of the Department of Environmental Management.

*John M. Stevens* (*Randall Kromm* with him) for Wachusett Mountain Associates, Inc.

*Thomas B. Bracken* for the plaintiffs.

*Irene C. Freidel & Marc D. Rie*, for Massachusetts Audubon Society, amicus curiae, submitted a brief.

SPINA, J. The Sierra Club and others (plaintiffs) brought an action in the Superior Court under G. L. c. 214, § 7A[3]; G. L. c. 30, § 61; and G. L. c. 231A, seeking declaratory relief against the Secretary (Secretary) of the Executive Office of Environmen-

---

[3]The Superior Court has jurisdiction under G. L. c. 214, § 7A, to hear actions by citizens alleging actual imminent damage to the environment due to failure to comply with G. L. c. 30, § 61. See *Boston* v. *Massachusetts Port Auth.*, 364 Mass. 639, 646 (1974) (decided under G. L. c. 214, § 10A, which, after c. 214 was reorganized in 1973, now appears as § 7A).

tal Affairs (EOEA), relating to his certificate approving the Supplemental Final Environmental Impact Report (SFEIR) submitted by Wachusett Mountain Associates, Inc. (WMA), for the expansion of facilities at the Wachusett Mountain Ski Area within the Wachusett Mountain State Reservation (reservation). The expansion proposed (1) construction of new ski trails; (2) widening of existing ski trails; (3) expansion of the base lodge facilities; and (4) upgrades to snowmaking equipment, piping, lighting, and ski lifts.[4] The plaintiffs sought both injunctive and declaratory relief against the commissioner of the Department of Environmental Management (department), relating to the findings under G. L. c. 30, § 61,[5] and the approval to commence work on a portion of the project, namely, upgrading ski lifts.

On cross motions for judgment on the pleadings, see Superior Court Standing Order 1-96, a judge in the Superior Court dismissed the case against the Secretary.[6] As to the alleged inadequacies in the SFEIR, the judge concluded that there was insufficient basis in the record to support that portion of the SFEIR pertaining to the construction of new trails and the expansion of existing trails. He determined that the SFEIR was deficient in that it failed to address adequately (a) the need for the trail work; (b) alternatives to the trail work; and (c) the environmental impacts of the trail work. He also concluded that the commissioner's findings under § 61 that the project was needed and that all feasible measures had been taken to avoid or minimize environmental damage from the trail work were

---

[4]His certificate stated that the supplemental final environmental impact report (SFEIR) "*adequately and properly* complies with the Massachusetts Environmental Policy Act (G. L. c. 30, §§ 61-62H) [MEPA] and with its implementing regulations (301 [Code Mass. Regs. §§] 11.00)" (emphasis in original).

[5]General Laws c. 30, § 61, states, in part: "Any determination made by an agency of the commonwealth shall include a finding describing the environmental impact, if any, of the project and a finding that all feasible measures have been taken to avoid or minimize said impact." Its "requirement of findings is the statute's principal enforcement component, because an agency may not act (in this case, the department may not issue the required permit) without them." *Enos* v. *Secretary of Envtl. Affairs*, 432 Mass. 132, 137 (2000).

[6]The plaintiffs did not appeal. The claim against the Secretary was properly dismissed. See *Enos* v. *Secretary of Envtl. Affairs, supra* at 138-139.

not supported by substantial evidence. In addition, the judge concluded that the plan to cut trees in the locations of the proposed trail work conflicted both with the Resource Management and Protection Plan (RMPP) developed by the department for the reservation, as well as with the department's old growth policy (OGP) (a Statewide policy designed to set standards for activities in and around the dwindling natural resource of "old growth" forest). Finally, he affirmed that portion of the SFEIR and the § 61 findings relating to the base lodge, the fixtures and equipment, and the commissioner's approval to commence work on upgrading ski lifts.

The judge permanently enjoined the commissioner "from authorizing or permitting WMA to implement plans for constructing new [ski] trails or widening existing ones [within the Wachusett Mountain Ski Area]." He also ordered that declaratory judgment issue declaring that authorization by the department allowing WMA to "construct or widen [ski] trails in the [particular area planned] would violate G. L. c. 30, § 61, requiring [the department] to take all feasible measures to avoid or minimize environmental damage." He remanded the case to the department for action consistent with his opinion and order. The commissioner and WMA appealed.

On appeal, the commissioner and WMA claim that the judge applied an improper standard of review and that he failed to give deference to the commissioner's § 61 findings. They also argue that the SFEIR and the § 61 findings were adequate, and that the judge misinterpreted and misapplied the RMPP. The plaintiffs urge us to affirm the decisions below, and argue that the commissioner was not authorized to make the type of decisions he made regarding the expansion of the ski area, but that such decisions are properly within the purview of the board of environmental management (board).[7] We transferred the case to this court on our own motion, and now vacate the judgment.

1. *Background.* The reservation consists of approximately 2,000 acres of land, mostly forested, located in the towns of Princeton and Westminster. Established in 1899 and owned by

---

[7]General Laws c. 21, § 2, provides that the department of environmental management shall be under the control of the board of environmental management.

the Commonwealth, the reservation is managed by the division of forests and parks within the department.[8] See G. L. c. 132; G. L. c. 132A. In 1958, the Legislature authorized the development of publicly operated ski areas at State reservations and other lands. See G. L. c. 132A, § 2D, inserted by St. 1958, c. 656, § 1. Various entities operated the ski area at the reservation from 1962 until 1969, when WMA successfully bid for a five-year contract to operate the ski area. Statute 1977, c. 287, authorized the commissioner to enter into a thirty-year renewable lease of "a portion of land on Wachusett Mountain [S]tate reservation, for the support of skiing facilities . . . [on] four hundred and fifty acres, more or less." After environmental review under the terms of G. L. c. 30, §§ 61-62H (Massachusetts Environmental Policy Act or MEPA), a commissioner entered into a thirty-year lease for the ski area with WMA.

In 1993, WMA, hoping to expand the ski area by adding new ski trails and widening existing ski trails within the 450 acres under lease, began a new MEPA review process by filing an environmental notification form (ENF) with the Secretary, which, as modified by later documents and changes, is the subject of this controversy.[9] See *Enos* v. *Secretary of Envtl. Affairs*, 432 Mass. 132, 136-138 (2000) (describing in detail process of review under MEPA); *Secretary of Envtl. Affairs* v. *Massachusetts Port Auth.*, 366 Mass. 755, 760-761 (1975)

---

[8]The department was established by the Legislature through St. 1953, c. 631 (codified at G. L. c. 21). It has the "duty . . . to exercise general care and oversight of the natural resources of the commonwealth . . . and to propose and carry out measures for the protection, conservation, control, use, increase, and development thereof." G. L. c. 21, § 1. "[N]atural resources" include "wild birds . . . wild mammals and game . . . forests and all uncultivated flora . . . land, soil . . . lakes, ponds . . . underground and surface waters." *Id.* In addition the department "shall also be concerned with the development of public recreation as related to such natural resources; and shall have control and supervision of such parks, forests, and areas of recreational . . . significance as may be from time to time committed to it." *Id.*

[9]The documents submitted by or on behalf of Wachusett Mountain Associates, Inc. (WMA) to the Executive Office of Environmental Affairs (EOEA) for purposes of review under MEPA (referred to jointly as the MEPA submissions) were the environmental notification form (ENF), followed by a draft EIR (DEIR), notice of project change (NPC) (in response to the discovery of an "old growth forest"), final EIR (FEIR), and the SFEIR.

(same). The MEPA review for this project lasted about six years. The plans underwent a significant change when a large area of "old growth forest"[10] was discovered on the slopes of Mt. Wachusett. As a result, WMA modified the proposed location of new ski trails to place all new clearing and widening of ski trails outside of the area where the old growth forest was located, and it filed a corresponding notice of project change.

During the MEPA review process, in part because of the order of the Secretary to do so, and in part because the existing plans were outdated, the department began review of its resource management plan for the reservation. That review resulted in a new plan, the RMPP, that created several zoning overlays for the mountain, each of which allows, and prohibits, certain activities.[11] The proposed improvements to the ski area[12] are located within the biodiversity significance overlay zone, an area designated in the RMPP as an additional buffer to protect the old growth forest.

On April 1, 1999, the Secretary issued his certificate of compliance under MEPA for the SFEIR.[13] On August 6, 1999,

---

[10]"Old growth forests" are defined in the department's old growth policy (OGP) as stands of trees greater than five to ten acres in area, with no significant sign of human post-European settlement disturbances, with a component of trees that are greater than fifty per cent of the maximum longevity for the particular species, and with a component of younger trees that are filling in the gaps created by natural aging and loss of the older trees. The old growth forest on Mt. Wachusett is specifically mentioned in the OGP as the "only one east of the Connecticut River . . . and is the only documented old-growth stand in Massachusetts that has a significant oak component."

[11]Of relevance to this case are the biodiversity significance overlay zone and the old growth significance overlay zone. These zones are discussed in more detail below.

[12]The portion of the proposed expansion that the Superior Court enjoined is the construction of a new "alpine park" including a "half pipe" for snowboarders, an alpine race trail, and the widening of a variety of existing trails in the ski area. All of this work is within the biodiversity significance overlay zone. These proposals require clear cutting eight acres for two new ski trails and clearing an additional four and one-half acres to widen existing ski trails.

[13]The Secretary's certificate references the RMPP as follows: "I am requiring the [department] to submit the final [RMPP] for the [reservation] for review under MEPA prior to the start of the 1999-2000 ski season. . . . I am satisfied that the draft RMPP and the SFEIR, viewed jointly, satisfy the requirements of the August 1998 certificate," in which his predecessor had required the SFEIR to focus on " 'presenting a proactive management plan

the commissioner issued his § 61 findings, thus completing the MEPA process and clearing the way for WMA to seek permits or approvals.[14] On the same day, the commissioner sent a letter to the president of WMA stating that the department "has reviewed the ski lift upgrade and replacement information submitted by WMA and approves commencement of construction activities related to this aspect of the project." The plaintiffs filed their complaint on August 27, 1999, within thirty days of the issuance of a permit, as required by 301 Code Mass. Regs. § 11.14(2)(a) (1998).[15]

2. *Jurisdiction.* The commissioner argues that the judge had no authority to review the sufficiency of the submitted environmental impact reports because the Secretary had certified the MEPA submissions and the plaintiffs lacked standing to

for WMA's current and future operations, in the context of [the department's] resource protection plan for the mountain and its old growth policy.' . . . The long and often heated debate over the ski area expansion has proved that such a plan [referring to the RMPP] offers the only responsible approach to planning for the mountain's future."

He further states that "the final RMPP will rest on the following principles: Protecting the Old Growth Forest . . . . Setting Limits on Timbering. Surrounding the Old Growth Overlay Zone, the RMPP will set aside over 1000 acres — more than half of the total area of the [r]eservation — as a protected Stewardship Overlay Zone [this area was referred to in the final document as the biodiversity significance overlay zone]. All commercial timbering will be banned within the Stewardship Overlay Zone, to protect the maturing forests around the summit and allow them to regain an old growth character. . . ."

[14]The commissioner's findings state: "These findings are issued in conjunction with [an RMPP] developed by [the department] to address management of the approximately 2025 acre [reservation] as a whole. . . . [T]he management recommendations set forth in the RMPP establish a framework to reinforce cooperation between [the department] and WMA in the management and protection of natural, cultural and recreational resources supported by [the reservation]. . . . In addition to the conditions described in these Findings, the construction and operation of the proposed ski area are governed by [lease provisions] and by recommendations set forth in the RMPP dated June, 1999." He later states: "These [§] 61 Findings conclude the MEPA process for the proposed ski area improvements, and enable [the department] to integrate mitigation measures described in the SFEIR and Secretary's Certificate, and to implement the recommendations of the RMPP as they pertain to ski area operations."

[15]"An action or proceeding alleging that a . . . final EIR for a Project undertaken by a Person fails to comply with MEPA and 301 [Code Mass. Regs. §§] 11.00 shall commence no later than 30 Days following the first issuance of a Permit . . . ." 301 Code Mass. Regs. § 11.14(2)(a).

challenge that certification. See *Enos* v. *Secretary of Envtl. Affairs, supra* at 138. In *Enos* we said that the plaintiffs lacked standing to challenge the Secretary's certification of a final supplemental environmental impact report (FSEIR) because at that stage no harm flows from the information gathering that MEPA is intended to generate. *Id.* at 138-139. We also indicated, however, that "an action may lie to seek revocation of the approval of the FSEIR and the submission of a revised report" after the permit authorizing a project has been approved. *Id.* at 142. Here, a permit for a portion of the project effectively was issued when the commissioner gave his approval to begin work on the ski lifts. Therefore, the case was properly before the Superior Court. *Id.*

Although no permits have been issued for the trail work, the questions concerning the adequacy of the SFEIR and the § 61 findings as they relate to the trail work were thoroughly litigated below, they have been fully briefed on appeal, and neither defendant argues that this aspect of the case is not ripe for review. Because these issues are properly before us as the basis for allowance of work on the ski lifts that service the ski trails, because the issues are of public interest, and because they will be relitigated as other permits are issued if we do not address them now, we exercise our discretion to consider these questions as they relate to the ski trails. See *Norfolk* v. *Department of Envtl. Quality Eng'g*, 407 Mass. 233, 238 n.9 (1990).

3. *Standard of review.* The commissioner and WMA argue that the judge applied an incorrect standard of review, namely, the "substantial evidence" standard under G. L. c. 30A, § 14,[16] to the commissioner's § 61 findings. They rely on *Boston* v. *Massachusetts Port Auth.*, 364 Mass. 639, 661-662 (1974), quoting *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 490 (1973), where the court stated that, "[a]lthough the Authority's actions in making the findings and determinations required by § 61 is properly neither 'adjudica-

---

[16]"Substantial evidence" is defined in G. L. c. 30A, § 1 (6), as "such evidence as a reasonable mind might accept as adequate to support a conclusion." Under the substantial evidence standard, a reviewing court must examine the entire record, including any evidence that detracts from the weight of the agency's decision. See *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966).

tory' nor 'regulatory,' in terms of the purposes to be served by judicial review it is much closer to the latter. . . . Such determinations, then, are not of the type as to which a reviewing court 'should search the factual and legal basis' or require 'an explanatory statement which . . . [it] can examine and criticise.' " Because, they claim, the commissioner's § 61 findings are more regulatory[17] than adjudicatory[18] in character, the judge should have reviewed those findings under the rational basis standard, rather than the standard of substantial evidence, and he should have shown greater deference to the agency's findings. See *Receiver of the Boston Hous. Auth.* v. *Commissioner of Labor & Indus.*, 396 Mass. 50, 57-58 (1985). We agree.

Although the commissioner's § 61 findings and his approval of portions of the proposed expansion necessarily affect WMA's interests, they did not constitute an adjudication of WMA's rights. Unless an adjudicatory hearing is required by constitutional right or statute, the fact that some type of hearing is permitted or required does not imply that it is adjudicatory. We must look to the nature of the proceeding below. See *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 144 (1972). "The question is not to be decided by a mechanical process of categorization; rather we rely on the considerations of functional suitability . . . ." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, *supra* at 488.

The process by which WMA sought to expand the ski area facilities was not an adjudicatory process, but a negotiation

---

[17]In describing a "regulatory" action, this court explained, "What was at stake in the departmental proceeding . . . was a set of rules for the future affecting the relations of two industries with an indeterminate public, rules that would fill out or complement a large statutory scheme administered by the department. The proceeding could not be fittingly described as intended simply to determine the particular legal interests of specifically identified persons." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 486 (1973). See *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 138-145 (1972).

[18]General Laws c. 30A, § 1 (1), defines "[a]djudicatory proceeding" as "a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing." See *Milligan* v. *Board of Registration in Pharmacy*, 348 Mass. 491, 494-500 (1965).

process culminating in a lease modification[19] over which the nonadjudicatory MEPA process was superimposed. The "informal and informational public consultation"[20] permitted under EIR review and the Secretary's certification are not adjudicatory proceedings. Cf. *Walpole* v. *Secretary of the Executive Office of Envtl. Affairs,* 405 Mass. 67, 72-73 (1989) (Secretary's certificate under MEPA was neither judicial nor quasi judicial, but discretionary, and not reviewable on writ of certiorari). An adjudicatory hearing is not required before the issuance of § 61 findings, which must be "base[d] . . . on the EIR." 301 Code Mass. Regs. § 11.12(5)(a) (1998).

The final approval from the department needed by WMA, the commissioner's approval of a modification to its lease, did not result from the commissioner's adjudication of WMA's rights,[21] but from his exercise of a legislative function. The disclosure hearing required under St. 1977, c. 287,[22] is nonadjudicatory,

[19]In his § 61 findings, the commissioner ordered that the mitigation measures he found necessary to protect the environment be incorporated as modifications to WMA's lease. This aspect of his findings complies with 301 Code Mass. Regs. § 11.12(5)(b)(1) (1998), which states: "Provided that mitigation measures are specified as conditions to or restrictions on the Agency Action, the Agency shall . . . make its [§] 61 Findings part of the Permit, contract or other document allowing or approving the Agency Action, which may include additional conditions to or restrictions on the Project in accordance with other applicable statutes and regulations . . . ."

[20]Title 301 Code Mass. Regs. § 11.08(3) (1998) states: "An agency undertaking a Project may hold public hearings, informal workshops, or public meetings at appropriate times prior to and during preparation of an EIR. The Agency shall provide at least seven Days notice of any hearing, workshop, or meeting to allow any other Agency or Person to prepare adequately and to make informed comments at the hearing, workshop, or meeting. The Secretary may hold an informational meeting prior to or during review of the EIR, and may, in the Scope, require the Proponent to hold an informational meeting." See 301 Code Mass. Regs. § 11.06(2) (1998) (public consultation during ENF review).

[21]The plaintiffs had no claim to an adjudicatory proceeding concerning the proposed expansion. Their role in the process was limited. See *Enos* v. *Secretary of Envtl. Affairs,* 432 Mass. 132, 137-138 (2000).

[22]Statute 1977, c. 287, states in relevant part: "The department not less than sixty days before such lease is executed, and not less than one year before significant construction or physical expansion within the said leased area is approved, shall conduct one or more public hearings in the Mount Wachusett area *for the purpose of disclosing* the scope, capacity and basic specifications of the proposed ski facility, the provisions incorporated in design to cope with

and instead has as its purpose public comment and scrutiny of agency action. The commissioner's decision to approve a particular lease or lease modification agreement for the ski area is an exercise of the powers and duties delegated to him for the purpose of implementing the legislative policy for development of certain State-owned lands for recreational purposes while preserving the natural state of such lands so far as practicable. See G. L. c. 132A, §§ 2-2D. The Legislature has also determined, through the enactment of St. 1977, c. 287, that it is in the public interest to allow the commissioner to enlist private capital for the construction, operation, and maintenance of the ski area, which will benefit the public interest. See *Court St. Parking Co.* v. *Boston*, 336 Mass. 224, 230 (1957); *Lowell* v. *Boston*, 322 Mass. 709, 736 (1948). As such, the commissioner's decision to approve WMA's lease agreement with the § 61 mitigation measures, and any other measure he may require, is a legislative decision. See *Receiver of the Boston Hous. Auth.* v. *Commissioner of Labor & Indus.*, *supra* at 58; *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, *supra* at 140.

The standard of review in such cases is arbitrary or capricious, that is, lacking a rational basis.[23] See *Receiver of the Boston Hous. Auth.* v. *Commissioner of Labor & Indus.*, *supra* ("error of law . . . [or] arbitrary or capricious, that is, as lacking a rational basis"). Because both the Secretary and the commissioner had broad discretion in their respective roles of identifying and minimizing environmental impacts of the proposed expansion based on public input and factual analyses, somewhat analogous to the rate setting process, the appropriate test is the arbitrary or capricious test. See *id*. See also *Yerardi's Moody St. Restaurant & Lounge, Inc.* v. *Selectmen of Randolph*, 19 Mass. App. Ct. 296, 300 (1985), quoting *Caswell* v. *Licensing Comm'n of Brockton*, 387 Mass. 864, 878 (1983) (where agency has broad discretion in the matter, review "is limited to a search for 'error of law or abuse of discretion, as measured by

sewage disposal, highway traffic and police and fire protection and the provisions regarding selection of a private individual or corporation to construct and operate said areas and the details relative thereto" (emphasis added).

[23]We do not decide what the standard of review should be in cases where § 61 conditions are attached to a permit issued as a result of an adjudicatory proceeding.

439 Mass. 738 (2003)                                                 749

Sierra Club *v.* Commissioner of the Department of Environmental Management.

the arbitrary or capricious test' "). Cf. *Forsyth Sch. for Dental Hygienists* v. *Board of Registration in Dentistry*, 404 Mass. 211, 217 (1989) (where agency "is free to use its judgment in determining when and to whom to grant exemptions from its regulations," arbitrary or capricious test will be applied in certiorari action). The process by which the information is gathered, identified, and applied to the statutory standards under MEPA must be logical, and not arbitrary or capricious.[24] See *Receiver of the Boston Hous. Auth.* v. *Commissioner of Labor & Indus.*, *supra* at 58.

4. *The SFEIR.* The commissioner and the WMA argue that the judge erred by concluding that the SFEIR submitted by WMA violated G. L. c. 30, § 62B, and 301 Code Mass. Regs. § 11.07 (1998) because it failed to address the need for the proposed project, it failed to address reasonable alternatives to the new trails and widening of existing trails, and it failed sufficiently to identify and analyze the impacts of the project on the old growth forest. They contend that they were not required to address need, and that the Secretary's certification of the SFEIR was not arbitrary or capricious.

(a) *Need.* The judge's decision criticized the SFEIR as containing inadequate analysis or information about the need for the expansion of the ski area. Neither the MEPA statute nor the regulations contain any requirement that an EIR should include an analysis of the "need" for the project itself, or that such an analysis be incorporated in the § 61 findings. See G. L. c. 30, §§ 61-62H; 301 Code Mass. Regs. §§ 11.00 (1998). The statute addresses "need" only as to the question of the need for an environmental impact report. G. L. c. 30, §§ 62A, 62H. Nonetheless, as is often the case, the MEPA submissions here included a variety of statements by the proponent as to its perceived need for the project. These statements included analyses of the changing demographics of skiers in the New England area, showing that the new trails would be used for

---

[24]This test is to be distinguished from the more deferential test used to scrutinize the validity of a regulation by inquiring if there is any conceivable rational basis, from whatever source, to support it. See *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 553-554 (1985).

750                  439 Mass. 738 (2003)

Sierra Club *v.* Commissioner of the Department of Environmental Management.

snowboarders, for free-style skiing, and for ski-race training, and that the type of terrain created in the "alpine park" (including a 250- to 300-foot long "half pipe") is increasingly in demand by a growing percentage of those who use the ski area. The added benefit of increasing skier safety was also included in WMA's statements pertaining to the need for ski trails. The need for additional space in the skier services building and base lodge, increased parking, and improvements to ski lifts and ski lift capacity, as well as to water supplies and snowmaking equipment, were all detailed throughout the MEPA submissions. These submissions adequately described WMA's perceived need for the project, and provided more than was required.

(b) *Alternatives.* The judge ruled that "[a]n adequate and appropriate EIR must contain . . . a description of reasonable alternatives to the project including a review of the no build option." This language is derived from 301 Code Mass. Regs. § 11.07(6)(f)(2), which requires an EIR to contain a description and analysis of alternatives to the project, including "the alternative of not undertaking the Project (i.e., the no-build alternative) *for the purpose of establishing a future baseline* in relation to which the Project and its alternatives can be described and analyzed and its potential environmental impacts and mitigation measures can be assessed" (emphasis added). The various MEPA submissions, together with the RMPP, the OGP, and the various studies of the flora and fauna of Mt. Wachusett, together established a thoroughly studied baseline that adequately complied with the requirements of this section.

Other alternatives to the location of the proposed alpine park were raised during the MEPA process. The plaintiffs contend that those alternatives were never adequately studied. The plaintiffs would have both the Secretary and the commissioner conduct an exhaustive search for alternatives that the MEPA statutes do not require. WMA points out that its MEPA submissions made after the filing of its notice of project change constitute an alternative to its original plan, and were made in response to the discovery of old growth forest within which its original plan had contemplated creating new ski trails. WMA argues that there were no further reasonable alternatives "outside the [old growth forest] and inside the existing trail

foot-print [within the ski area] that was large enough to contain [the new trails]." We agree.

In the commissioner's memorandum to the board, dated July 11, 2000, he retrospectively summarized the alternative site analysis conducted by WMA during the MEPA process. He stated that the criteria that WMA had sought to meet for a new trail location were (1) that the trails be outside and not immediately adjacent to the old growth forest administrative boundaries; (2) that the new trails be within the footprint of existing trails, so as not to fragment a currently intact forest ecosystem; (3) that the trail location have a slope of about fifteen per cent; and (4) that the trails not be located where they would cross streams. Alternative sites within the ski area that might meet these criteria were assessed. One was rejected because it was "bisected with drainage swales, is too narrow for two full trails, and is close to the old growth forest administrative area." Other areas that were outside of the existing footprint of ski trails were also examined, but rejected either because they would have fragmented large forest areas, crossed streams, or been "partially within or immediately adjacent to the old growth forest." In sum, alternatives were both discussed and considered, and the Secretary's and commissioner's acceptance of the eventually approved plan was not arbitrary or capricious by reason of a failure to consider alternatives.

(c) *Environmental impacts.* The judge's analysis of the SFEIR led him to conclude that the MEPA submissions failed properly to assess environmental impacts arising from the proposed expansion. The MEPA submissions, and the Secretary's certifications of each, all discussed and assessed the potential impacts of the project on various aspects of the ecology of the reservation and the surrounding areas. For example, the FEIR discussed the impact of the proposed new trails on the old growth forest, on wildlife habitats and on vegetation, and discussed mitigation measures that would be put in place to minimize the environmental impact. As discussed below, the judge's analysis misapprehended the RMPP, which expressly contemplated expansion of the ski area, including clearing of forest for new trails, as a permitted use within the leased ski area. Environmental impacts were adequately considered. We

conclude that the Secretary's certification was not arbitrary or capricious.

5. *Section 61 findings and the RMPP.* The commissioner and the WMA argue that the judge erred by concluding that the record did not support the § 61 findings confirming the need for new trails and that all feasible measures had been taken to avoid or minimize environmental damage. They further contend that the judge erred by concluding that construction of new trails and widening of existing trails would violate the RMPP and the OGP.

(a) *Need.* As stated above, the statutes and regulations governing the MEPA process do not include any requirement for a "need" analysis in the EIR process, nor do they require any discussion of "need" in the agency's § 61 findings. Nonetheless, the commissioner's § 61 findings describe the need for the project as allowing the ski area to increase its capacity as well as its ability to cater to the evolving tastes of its customers for varied skiing terrain.

(b) *Feasible measures to avoid or minimize environmental damage.* The judge concluded that the commissioner's § 61 findings failed to adequately demonstrate that all feasible measures had been taken to avoid or minimize environmental damage. General Laws c. 30, § 61, requires that departments of the Commonwealth "review, evaluate, and determine the impact on the natural environment of all works, projects or activities conducted by them" and requires them to "use all practicable means and measures to minimize damage to the environment." A finding is required by the statute "describing the environmental impact, if any, of the project and a finding that all feasible measures have been taken to avoid or minimize said impact."

The commissioner's § 61 findings extensively described both the potential sources and nature of environmental impacts arising from the proposed expansion of the ski area, as well as the measures that would be required of WMA to mitigate and minimize the impacts on the environment. The findings addressed the issues of impact on the old growth forest, including so called "edge effects." "Edge effects" are discussed within the RMPP and described as events that "often occur within the

transition zone between one type of habitat and a distinctly different type of habitat (e.g., forest and meadow). Edge effects may have either beneficial or negative ecological repercussions." Because there are locations where edge effects come close to the old growth forest, a monitoring program has been incorporated into the RMPP "adjacent to ski trails and at the [reservation] visitor's center, where abrupt edges occur between Old Growth and cleared land. Specific parameters to be monitored include breeding birds and presence of invasive species."

According to the OGP, edge effects may be reduced by maintaining a buffer of other "protection forest" that will consist "in so far as possible [of] forested areas where disturbance is either precluded or minimized." "The location and extent of these buffers will be dealt with in the site-specific management plans that will be prepared for each stand [of old growth forest]."[25]

The commissioner's § 61 findings also discussed the biological integrity of the ski area leasehold, wetlands and water resources, cultural resources, traffic impacts, and off-season events. His findings laid out mitigation measures appropriate to each area of concern. They also responded to comments received from the public. As such, the findings adequately fulfilled the commissioner's obligations under G. L. c. 30, § 61, and were not arbitrary or capricious.

The only basis that the judge stated in support of his conclusion that the commissioner's § 61 findings were inadequate was his determination that an irreconcilable inconsistency existed between the prohibition of commercial silviculture within the biodiversity significance overlay zone and the commissioner's approval of the clearcutting of about twelve and one-half acres of forest within that zone for new and widened ski trails. As discussed below, the two are not inconsistent, and we hold that

---

[25]In his memorandum to the board dated July 11, 2000, the commissioner noted that the closest that the new trails come to the administrative boundary of the old growth forest on Mt. Wachusett (which, at that location, is an open roadway) is about 170 feet, and the closest the trails come to actual old growth trees is more than 300 feet. His memorandum concluded that there would be no significant adverse impact on the old growth forest by the new trail construction.

the commissioner's § 61 findings adequately addressed the requirements of § 61.

(c) *The RMPP.* The judge determined that the RMPP for Mt. Wachusett and the approval of the proposed expansion were inconsistent. In his opinion, the "RMPP provides no analysis, explanation, or justification for constructing new trails and widening existing trails in the [b]iodiversity [s]ignificance [o]verlay. . . . Thus the absence of [the department's] analysis of how permitting clear cutting of trees over a swath of twelve acres of mature forest in the [b]iodiversity [s]ignificance [o]verlay can be reconciled with banning partial cutting incident to commercial silviculture compels the conclusion of arbitrary treatment."

WMA argues that, by its own terms, the RMPP contemplates and permits the proposed expansion of the ski area and simultaneously applies the zoning overlays to the reservation. WMA points out that the EIR and the RMPP were "developed in concert" and are part of a "coordinated process . . . for improvement of the ski area which received environmental reviews that were extensive, proper and more than adequate." The proposed expansion is, in its view, "entirely consistent with the management plan for the Reservation as a whole." The commissioner also argues that his § 61 findings and the RMPP are consistent with one another. We agree.

The RMPP, which was adopted by the board on July 11, 2000,[26] under authority of G. L. c. 21, § 2F,[27] sets forth the management objectives for the department's stewardship of the reservation. These management objectives were developed "in specific consideration of the natural, cultural, and recreational resources provided by [the reservation]" and their purpose was to "assist [the department] personnel in making management

---

[26]The RMPP for the reservation went through several drafts. At a minimum, there was a draft dated January 14, 1998; a different draft was included in the submission of the SFEIR to the Secretary on February 16, 1999; a third, mentioned in various documents, is dated May 21, 1999; and the final version is dated June, 1999. All of these preceded the issuance of the commissioner's § 61 findings, which were dated August 6, 1999.

[27]General Laws c. 21, § 2F, requires the commissioner to submit management plans for State reservations to the board for adoption.

decisions in the day-to-day operation of the [r]eservation."[28] The department's role, as set forth in the RMPP, is to manage the reservation so that a variety of activities can coexist without interfering with one another or "with the natural and cultural resources present on the [r]eservation."

One of the tools the department adopted to meet this goal was the implementation of land stewardship zoning.[29] The basic principle is to define the appropriate land use for a particular resource area by zoning the land according to a scheme that designates areas (in decreasing order of resource sensitivity) as either environmental protection zones, conservation zones or intensive use zones. In addition, where conditions warrant, the department can establish significance overlay zones that may overlap the underlying zone, completely or in part, to "allow[] management activities to be tailored more specifically to the particular resource, and [those significance overlay zones] may be more restrictive tha[n] the [e]nvironmental [p]rotection [z]one."

The RMPP establishes four significance overlay zones for the reservation. The first, the old growth significance overlay, corresponds to the "[a]dministrative [l]imits"[30] of the old growth forest as mapped out on the mountain. Within the old growth significance overlay, "any potentially disruptive activities that might negatively [a]ffect the integrity of this ecosystem will be either prohibited or constrained to protect and maintain the integrity of this ecosystem." Although the old growth significance overlay encircles the summit of Mt. Wachusett, it does

---

[28]Among the objectives of the RMPP were to (1) "Manage and protect the natural resources of the reservation to ensure a diverse and sustainable ecosystem . . ."; (2) "Maintain the high quality of water delivered by the watersheds of the [r]eservation"; (3) "Manage and protect the cultural resources of the [r]eservation . . ."; (4) "Provide and maintain safe, enjoyable, diverse outdoor recreation opportunities, within the limits of the natural and cultural resources of the [r]eservation . . . ."

[29]This land planning tool was developed at and for the reservation in 1979. In 1990 it was adopted by "all EOEA agencies with land management responsibilities."

[30]The administrative limits were described in the RMPP as the main body of the old growth forest extended to a nearby natural or manmade boundary, so that a clearly defined and easily recognized area could be delineated. Some buffer area was built into the delineation of the administrative limits.

not overlap the area at the summit where intensive uses were long established (an area that falls under the summit natural and cultural resources significance overlay zone). The RMPP states that "[t]he directives established under the department's [S]tatewide [OGP] apply throughout that portion of [the reservation] designated under the [o]ld [g]rowth [s]ignificance [o]verlay."

The second significance overlay created at Mt. Wachusett was the "biodiversity significance overlay" zone, which covers nearly the entire mountain, from the perimeter of the old growth significance overlay to the boundaries of the reservation to the west and north, and to the base of the slopes to the south. The proposed alpine park is entirely within the biodiversity significance overlay, as are the areas where WMA planned to widen existing ski trails.[31]

The RMPP states: "The biodiversity significance overlay provides an additional buffer to the northern and southern flanks of the [o]ld [g]rowth [s]ignificance overlay. The biodiversity significance overlay *will allow* continued use and maintenance of the numerous hiking and skiing trails within the limits of the overlay, including *any necessary infrastructure improvements* (e.g., dam reconstruction at Echo Lake and Everett Pool, *annual ski area work plans*). *No commercial silvicultural activities will be allowed* within the biodiversity significance overlay, however management of early successional vegetation will be undertaken to maintain scenic vistas, restore High Meadow to grassland, and to allow the continuation of the existing utility corridor, until such time that technological advances and financial feasibility enable its discontinuation." (Emphases added.)

Appendix I to the RMPP includes a document entitled "Approval Process for All Construction, Maintenance and/or Alterations at Wachusett Mountain Ski Area." Paragraph A of

---

[31]The final two zones created by the RMPP are the interior forest habitat significance overlay and summit natural and cultural resources significance overlay. The interior forest habitat significance overlay is a remote area entirely outside the western boundary of the ski area, traversed by only one hiking trail, and it is designated as an area within which "no additional recreational facilities will be developed." The summit overlay designates specific natural and archaeological features of the summit for protection. These overlays are not involved in this appeal.

that document states that "[o]n or before March 15th of each year, [WMA] shall submit to [the department] working plans and specifications and proposed project schedules for all work projects proposed to commence within the following 12 months. Work projects shall *include, but not be limited to* the erection, *modification,* addition, *removal or alteration of* any building(s), lift(s), *natural features or resources,* or structure *of any nature and/or projects involving removing, filling, dredging, drilling, excavating, grading or landscaping within the leased premises."* (emphasis added). Thus, although the RMPP's biodiversity significance overlay zone prohibits commercial silviculture, it expressly envisions the type of work that WMA proposes for the leased ski area. The arguments and counterarguments pertaining to the meaning of the RMPP's prohibition on commercial silviculture, and whether that ban applies or does not apply to the clearing of land for new ski trails, are rendered extraneous by the scope of the annual ski area work plans permitted within the biodiversity significance overlay zone, and thus on the leased ski area. Because the RMPP permits the type of trail work proposed by WMA, the § 61 findings and the RMPP are not in conflict.

6. *Authority of the commissioner.* The plaintiffs argue that only the board has authority to approve or disapprove plans to expand the ski area, and that the commissioner has no authority to allow the project to proceed. The judge ruled against the plaintiffs on this issue, noting that the commissioner has extensive authority both under G. L. c. 132A and under the authority vested in him by St. 1977, c. 287, to make decisions with regard to the development and improvement of State reservations. The judge further noted that the commissioner's authority to make those decisions is subject to the requirement that his actions be "in accordance with such programs and policies as may from time to time be promulgated by the board of environmental management." G. L. c. 21, § 3. The plaintiffs did not appeal and therefore may not challenge this ruling. See *Boston Herald, Inc.* v. *Sharpe,* 432 Mass. 593, 599 (2000), quoting *Hartford Ins. Co.* v. *Hertz Corp.,* 410 Mass. 279, 288 (1991) ("failure to take a cross [petition] precludes a party from obtaining a judgment more favorable to it than the judgment

entered below"). Under the judge's ruling, the commissioner's power is limited to actions that comport with the department's policies, as determined by the board. As discussed above, the RMPP, a policy that the board adopted, specifically contemplates and allows for the expansion of the ski area, and thus the commissioner's actions conform to the department policies.[32]

7. *Conclusion.* We vacate the judgment and the orders granting the permanent injunction and the declaratory judgment. We also order a new declaratory judgment to issue stating that the certificate of the Secretary of the Executive Office of Environmental Affairs, which states that the Supplemental Final Environmental Impact Report (SFEIR) submitted by Wachusett Mountain Associates, Inc., "adequately and properly complies with the Massachusetts Environmental Policy Act (G. L. c. 30, §§ 61-62H) [MEPA] and with its implementing regulations (301 [Code Mass. Regs. §§] 11.00)," was properly issued; that the findings of the Commissioner of the Department of Environmental Management under G. L. c. 30, § 61, concerning the proposal by Wachusett Mountain Associates, Inc., as described in the SFEIR and other MEPA submissions, were properly issued; and that the Commissioner's § 61 findings do not conflict with the Resource Management and Protection Plan (1999) for the Wachusett Mountain State Reservation.

*So ordered.*

---

[32]The plaintiffs also argue that the department has not exhausted its administrative remedies before appealing the lower court's decision. They suggest that the proper course would have been an appeal to the Governor and the Executive Council under G. L. c. 30, § 5, which allows for such an appeal when a question or conflict over orders or rules arises between an executive department and its board. However, the statute also states "this section shall not deprive any person of the right to pursue any other lawful remedy." G. L. c. 30, § 5.