Rufo, Robert C., J.
INTRODUCTION
The Town of Barnstable (“the Town”) and the Alliance to Protect Nantucket Sound, Inc. and ten individual residents of the Commonwealth (collectively, “the Alliance”) filed this action challenging the issuance, under the Massachusetts Environmental Policy Act (“MEPA”), of a Final Environmental Impact Report Certificate (“FEIR”) for a proposed commercial wind energy facility in Nantucket Sound and on land in Barnstable and Yarmouth. This matter is before the court on the Alliance’s motion for judgment on the pleadings pursuant to Mass.R.Civ.P. 12(c) and Superior Court Standing Order 1-96. Also before the court is the Town’s motion for judgment on the pleadings. For the reasons discussed below, the Alliance’s motion is DENIED and the Town’s motion is also DENIED.
ADMINISTRATIVE RECORD
Defendant Cape Wind Associates, LLC (“CWA”) is the proponent of a renewable energy wind power project (“the Project”), consisting of 130 wind turbine generators (“WTGs”) on a grid over 25 square miles of sub-tidal area located on Horseshoe Shoal in Nantucket Sound. The wind generated electricity from each WTG will be transmitted via submarine transmission cables to an electric service platform (“Platform”) located within the WTG array in federal waters. The WTGs and Platform will hereinafter collectively be referred to as the Wind Farm. Approximately 12.5 miles of electric transmission cables will cross federal and then state waters to connect the Platform to Cape Cod’s mainland in Yarmouth. The transmission cables will then extend under existing public ways and an NSTAR Electric Company right-of-way and interconnect to the existing electric transmission grid at an NSTAR substation in Barnstable. This portion of the Project will hereinafter be referred to as the Cable Project. The Project will have a maximum potential electric output of approximately 454 megawatts of renewable power.
The MEPA ENF
CWA initiated state environmental review of the Project under MEPA by filing an Environmental Notification Form (“ENF”) with the Secretary of the Executive Office of Energy and Environmental Affairs (“the Secretary”) in November of 2001. On April 22, 2002, the Secretary issued a Certificate on the ENF, noting that the Project “represents one of the most ambitious *112 offshore renewable energy projects ever proposed anywhere in the world.” The Secretary determined that the Project is subject to MEPA review because it will require numerous state permits, approvals, and determinations, including a Water Quality Certificate under Section 401 of the Federal Clean Water Act, a variance under G.L. Chapter 91 Waterways regulations from the Massachusetts Department of Environmental Protection (“DEP”), approval from the Massachusetts Energy Facilities Siting Board (“EFSB’j, a construction permit from the Massachusetts Highway Department (“MHD”), approvals under the Massachusetts Wetlands Act, and determinations or permits from the Massachusetts Division of Fisheries and Wildlife (“DFW”). The Secretary stated:
Because the proponent is not seeking financial assistance from the Commonwealth for the project, MEPA jurisdiction extends to those aspects of the project that are within the subject matter of required or potentially required state permits and that have the potential to cause significant Damage to the Environment. In this case, given the broad scope of the Chapter 91 and EFSB permits, MEPA jurisdiction effectively extends to all aspects of the project that are within Massachusetts. The MEPA mandatory EIR threshold related to production of 100 or more MW of electricity does not apply to the project because the WTG is located outside the Commonwealth in federal waters. The portion of the project subject to MEPA does not meet or exceed any mandatory EIR thresholds. Nonetheless ... I find that the project has potentially significant environmental impacts, and I am thus exercising my discretion in requiring an EIR for the project.
With respect to jurisdiction over the Project, the Secretary found:
Because MEPA (like the Cape Cod Commission Act) is the product of state law, not federal law, MEPA review (and by extension Cape Cod Commission review) applies only to those portions of the project that are located within Massachusetts, including its territorial waters (generally within three nautical miles of the low water mark of the shore). I note that the proposed WTG array is located outside of Massachusetts and, therefore, is not subject to state regulatory requirements. CZM has broader jurisdiction because federal law (pursuant to the Coastal Zone Management Act) specifically delegates review authority over projects in federal waters to the Coastal Zone Management Office of the adjacent coastal state, provided that the state has a federally approved Coastal Zone Management Plan.
The Secretary stated in the ENF Certificate that he was deferring the detailed scoping of environmental issues associated with the Wind Farm to the federal government. He noted that CWA voluntarily agreed to provide information under MEPA concerning the Wind Farm although it was subject only to federal jurisdiction. However, the Secretary directed CWA to disaggregate the impacts of the Cable Project from those impacts occurring in federal waters.
The Project is subject to federal environmental review under the National Environmental Policy Act (“NEPA”), culminating in the issuance of a Final Environmental Impact Statement (“EIS”). In the ENF Certificate, the Secretary noted that CWA voluntarily committed to coordinated MEPA and NEPA review of the Project.
The MEPA DEIR
CWA filed a joint Draft Environmental Impact Report (“DEIR”) and Draft EIS in November of 2004. On March 3, 2005, the Secretary issued a Certificate on CWA’s DEIR concluding that the DEIR adequately and properly complies with MEPA and its implementing regulations (“DEIR Certificate”). In the DEIR Certificate, the Secretary stated that the FEIR should establish a clear baseline for consideration of alternatives to the Wind Farm and contain a concise, quantitative summary of the alternative technologies of coal, oil, and natural gas. The Secretary further stated that the FEIR should include analysis of the no-action alternative, a detailed analysis of the alternative south of Tucker neck Island site, and a discussion of the status of other renewable energy projects in the region, as well as alternative configurations for the Wind Farm, including a reduced number of turbines, spacing of turbines, and distance from shore. The Secretary noted that the FEIR should consider comments received relative to navigation safely. With respect to the Cable Project, the Secretary stated that the FEIR should contain mitigation for the temporary environmental impacts of laying the cables and connecting them to the Barnstable Switching Station.
With respect to DEP requirements, the Secretary stated in the DEIR Certificate that the FEIR should include information pertaining to a variance under Chapter 91 for a non-water dependent infrastructure facility and mitigation for the potential detriments to waterway interests. In addition, the Secretary stated that the FEIR should provide a detailed discussion as to how the Cable Project meets the requirements of the Ocean Sanctuaries Act, and address the comments of CZM to provide sufficient information to facilitate federal consistency review.
The Secretary stated that the FEIR should contain a revised air quality analysis characterizing the Project’s benefits in a more precise manner, and contain more detailed analysis of aviari impacts to correct identified deficiencies in the DEIR. Further, the FEIR should provide site-specific information about fisheries impacts, including a targeted resource survey to assess shellfish distribution and abundance, and potential restrictions on fishing caused by the monopiles and scour protection of the WTGs. The Secretary also stated that the FEIR should contain more detailed *113 eelgrass survey information and mitigation measures for impacts to eelgrass from the Cable Project.
Finally, the Secretary stated that FEIR should address water quality impacts, including those from the proposed jet plow method of embedding the submarine cables, and the impacts and mitigation for the dredge plan. The Secretary also stated that the FEIR should include analysis of the impacts on water quality and marine resources from a discharge of the 40,000 gallons of dielectric fluid contained in the Transformer. In addition, the FEIR should contain federally required pollution prevention and remediation plans.
In the DEIR Certificate, the Secretary strongly encouraged the filing of a joint Final EIS and FEIR, and urged CWA to delay any state filing to align with the Final EIS review process. Thereafter, however, the Federal Energy Policy Act of 2005 reassigned responsibility for review of the Project from the U.S. Army Corps of Engineers to the U.S. Department of the Interior Minerals Management Service (“MMS”). MMS determined that a new Draft EIS was required and began the federal scoping process anew, setting the MEPA and NEPA reviews on different schedules.
The MEPA FEIR
The Secretary published CWA’s FEIR in the Environmental Monitor on February 20,2007. The Alliance submitted comments on the Project to the Secretary on March 21 and 22, 2007, during the public comment period. They argued that the FEIR did not adequately analyze alternatives, project impacts, and mitigation, and urged the Secretary to require a Supplemental FEIR after the issuance of MMS’s revised Draft EIS. On March 21, 2007, the Cape Cod Commission (“CCC”) sent a letter to the Secretary strongly requesting that he require CWA to prepare a Supplemental FEIR because the FEIR inadequately addressed the adverse visual impact of the Project on historic resources, the potential avian risks of the Project, and alternatives to the Project, and because full information from the federal review process was not yet available.
On March 29, 2007, the Secretary issued a Certificate that the FEIR adequately and properly complies with MEPA and its implementing regulations (“FEIR Certificate”). The Secretary stated:
I believe that an ambitious program of renewable energy development is in the interests of the citizens of Massachusetts, and that the Commonwealth has an obligation to its citizens to promote development of renewable energy. Global climate change, sea level rise, dependence on foreign oil, and the health impacts of local and regional air pollution create an urgent need for sustainable alternatives to energy produced from fossil fuels. While new technologies are not without impacts themselves, these pale in comparison to the scale of impacts that continued fossil fuel emissions will have on the environment of Massachusetts.
The Secretary explained:
For this project, my obligation under MEPA is to ensure that the impacts of the construction and operation of the portions of the project within Massachusetts’ jurisdiction have been adequately avoided, minimized, and mitigated. I find that they have. The proponent has provided an extensive assessment of impacts related to the electric transmission cable, the portion of the project subject to MEPA jurisdiction, and as explained below has mitigated those impacts ... As for the wind farm itself, which for the most part lies outside of MEPA jurisdiction, the proponent has provided a significant amount of information regarding the [WTGs] located in federal waters . . . several state agencies and public commenters identify several aspects of the proponent’s environmental analysis of potential impacts of the WTG array in federal waters that require additional information and analysis, and I expect that these issues will be addressed in greater detail in the Draft EIS to be published by MMS.
With respect to jurisdiction over the Project, the Secretary found:
Because MEPA (like the Cape Cod Commission Act) is the product of state law, not federal law, MEPA review (and by extension Cape Cod Commission review) applies only to those portions of the project that are located within Massachusetts, including its territorial waters (generally within three nautical miles of the low water mark of the shore). The proposed WTG array is located outside of Massachusetts and, therefore, is not subject to state regulatory requirements. There is one notable exception: CZM [federal consistency review].
The Secretary noted:
Despite the jurisdictional limitations on MEPA review, the proponent agreed at the commencement of the MEPA process to voluntarily provide information ... as it relates to the entire project, including the WTG array in federal waters. The purpose of subsequent MEPA scopes addressed to the non-jurisdictional WTG array was to ensure that state issues regarding potential impacts and benefits to Massachusetts would be fully addressed through a scope voluntarily accepted by the proponent for the purposes of MEPA, and which represented state comments for the purposes of NEPA.
The Secretary then addressed joint MEPA/NEPA review, stating that although he supported continued coordinated review following the Energy Policy Act of 2005, he recognized that CWA was “entirely within its rights to file with MEPA before filing with MMS.”
In the FEIR Certificate, the Secretary noted that CWA would provide over $10 million in mitigation as compensation for the unavoidable impacts of the Proj *114 ect, stating, “for the most part, the proponent proposes mitigation for impacts in federal waters, and this mitigation is not required for purposes of MEPA. However, the proponent has voluntarily offered this mitigation in the MEPA context, and it is therefore appropriate to describe the mitigation in this certificate.” The Secretary found that:
the power produced by the project will mitigate impacts from Massachusetts generating facilities because it will serve to reduce demand on fossil fuel-fired facilities and thereby reduce air emissions from these facilities. The proposed project would reduce the need to construct additional fossil fuel-fired electric generation facilities as energy demand increases, facilitating the Commonwealth and the region’s air quality goals. The clean energy provided by the project will also serve as a mitigation measure in Massachusetts’ efforts to achieve attainment of the air quality standard for ozone.
Based on the air quality benefits, the compensatoiy mitigation, and the specific mitigation identified in pages 19-25 of this Certificate, I find that the environmental benefits and compensatory mitigation provided by the proj ect are adequate to mitigate the impacts of the project occurring in Massachusetts.
With respect to alternatives analysis, the Secretary stated:
In the certificate on the DEIR, I required that the proponents disaggregate the impacts of the project in the state territorial waters and overland from impacts that are occurring within federal waters, since the latter represent the aspects of the project that fall within the “voluntary” nature of MEPA review but lie outside the scope of state and local permitting. Therefore, the alternative analysis for state permitting purposes is related primarily to the cable route and its associated impacts. The FEIR adequately describes the potential impacts of the construction and operation alternatives of the electric transmission cables and measures to avoid, minimize and mitigate the potential impacts.
The Secretary then reviewed and summarized the environmental impacts of the Cable Project including impacts on air quality, birds, rare species, fisheries, shellfish, benthic area, aquatic vegetation, water quality and wetlands, as well as visual, historic, and archaeological impacts. With respect to a Chapter 91 license, the Secretary stated that DEP was responsible for making a determination whether the Project is water dependent, but concluded:
[t]he MMS final Record of Decision will ultimately determine the location of the project and the cable route. But, based on the information provided to date, the WTGs will be located offshore and as a consequence there [is] no reasonable alternative to the cable traversing tidelands subject to Chapter 91 jurisdiction. Should DEP determine that the project is non-water dependent, a variance under 310 CMR 9.21 will be required, and the proponent will also have to demonstrate compliance with 301 CMR 9.55. I find that the FEIR provides adequate information for DEP [to] act on the c. 91 license application, whether the project is ultimately characterized as water-dependent or non-water dependent.
With respect to fisheries, the Secretary stated that the FEIR adequately describes the potential impacts of the construction and operation of the electric transmission cables, and mitigation measures. However, the Secretary also stated: “there is a dispute over whether the wind farm will harm fisheries, and whether the proponent’s data is adequate to reach conclusions about that impact. Again, I note that the MMS-process, and not MEPA, is the proper forum to resolve these issues, and I instruct the state agencies that commented on this issue to provide their comments to MMS.” The Secretary then briefly summarized fisheries impacts in several paragraphs.
With respect to benthic and shellfish impacts, the Secretary stated that the FEIR adequately describes the impacts of the construction and operation of the cables, and mitigation measures. The Secretary noted that the Cable Project would utilize the jet plowing technique to install the cables, the benthos would recover in 1 to 2 years, and CWA would conduct a benthic monitoring program. The Secretary also addressed water quality issues arising from the suspension of sediments during the construction of the Cable Project.
In the FEIR Certificate, the Secretary noted that CWA committed to fully comply with decommissioning standards imposed by MMS, including financial responsibility requirements. With respect to navigation, the Secretary noted that CWA had revised the 2003 Navigational Risk Assessment to incorporate design changes and new information to address points raised by the Coast Guard, and was awaiting results from new FAA Aeronautical Surveys for each WTG.
In issuing the FEIR Certificate, the Secretary concluded that the FEIR was adequate because it:
provides a complete and definitive description and analysis of the jurisdictional portions of the project and its alternative, and contains an assessment of its potential environmental impacts and mitigation measures to enable state permitting agencies to understand the environmental consequences of their permit decisions . . . With respect to the non-jurisdictional aspects of the project, the DEIR and FEIR provide extensive information, and I fully expect that the comprehensive federal NEPA review conducted by MMS will supplement what has already been provided, provide a forum for continued public input into the non-jurisdictional aspects of the project, and appropriately resolve any lingering issues over the level and adequacy of data provided.
*115 On April 21 and 22, 2007, the Town and the Alliance sent timely notice of intent to sue to CWA, DFW, the Secretary, and the Attorney General pursuant to G.L.c. 30, §62H.
The plaintiffs filed this action on August 16, 2007 and thereafter, amended their complaint once by right. Count I of the plaintiffs’ First Amended Complaint asserted a claim against CWA and DFW that damage to the environment is about to occur within the meaning ofG.L.c. 214, §7A because the Secretary’s issuance of the FEIR Certificate was arbitrary and capricious and violates MEPA for numerous reasons, including the Secretaty’s erroneous conclusion with respect to jurisdiction over the Project; CWA’s failure to adequately address the potential fisheries, benthic, avian, navigation, visual, and historic impacts of the Project; and CWA’s failure to adequately evaluate feasible alternative locations for the Project, including land-based alternatives. Count II sought an order in the nature of mandamus requiring the Secretary to comply with MEPA by considering the impacts from the Wind Farm. Count III sought a declaratory judgment concerning the scope of the Secretary’s jurisdiction over the Project and a declaratory judgment that the FEIR fails to comply with MEPA. Count IV alleged that the Project will violate the Massachusetts Endangered Species Act (“MESA”) and sought an injunction against CWA. Finally, Count V alleged that the Secretary’s improper FEIR Certificate harms the Town and constitutes damage to the environment within the meaning of G.L.c. 214, §7A. CWA filed a motion to dismiss the First Amended Complaint for lack of jurisdiction and failure to state claims upon which relief can be granted.
EFSB Proceedings
Shortly after the issuance of the DEIR Certificate, EFSB issued on May 11, 2005 a final decision approving, with conditions, CWA’s petition to construct the electric transmission cables in state waters and on state land to connect the Platform to the regional electric grid on Cape Cod.[3] The Alliance appealed EFSB’s decision to a single justice of the Supreme Judicial Court pursuant to G.L.c. 25, §5 and G.L.c. 164, §69P. In their appeal, the Alliance did not challenge EFSB’s conclusion that the Cable Project was superior to other alternatives in terms of environmental impact. See Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 448 Mass. 45, 49 n.5 (2006). The court affirmed EFSB’s decision on December 18, 2006. See id.
Several years later, while CWA’s motion to dismiss the instant MEPA appeal was pending, EFSB issued on May 1, 2008 a “Final Decision on Project Change, Request for Extension, Section 72.” EFSB approved, subject to certain conditions, minor changes to the Cable Project requested by CWA. In addition, EFSB approved CWA’s request for a three-year extension of the deadline for commencing project construction. Finally, EFSB granted CWA’s petition pursuant to G.L.c. 164, §72 for á determination that the Cable Project is necessaiy, in the public interest, and will serve the public convenience. EFSB acknowledged that under MEPA, it was required to make Section 61 findings and stated:
the Siting Board undertook a comprehensive investigation and analysis of the environmental impacts of the transmission lines in its review and approval of the transmission lines in the Cape Wind Decision. The Siting Board, in issuing the Cape Wind Decision, found that the environmental impacts of the proposed transmission lines along the primary route would be minimized, and that the primary route would be preferable to the alternative route with respect to environmental impacts . . . Since the Cape Wind Decision and record of the Cape Wind Decision have been incorporated into the record of this case, the Siting Board determines that the analysis of environmental impacts in the Cape Wind Decision, as supplemented by the record in this decision, stands as the Section 61 review in this case. The Siting Board finds that all feasible measures have been taken to avoid or minimize the environmental impacts of the proposed transmission lines.
This Court’s Ruling on CWA’s Motion to Dismiss the MEPA Appeal
In a Memorandum of Decision and Order dated June 17, 2008, this Court (Kane, J.) allowed the defendant’s motions to dismiss Counts I and III of the First Amended Complaint to the extent that such counts sought to challenge the FEIR and Certificate based on the Secretary’s jurisdictional scoping determination. It is undisputed that Horseshoe Shoals in Nantucket Sound, the proposed location of the Wind Farm, lies outside Massachusetts’ three-mile territorial jurisdiction and within the federal government’s exclusive jurisdiction over the Outer Continental shelf. See Ten Taxpayer Citizens Group v. Cape Wind Assocs., 373 F.3d 183, 196-97 (1st Cir. 2004), cert. den., 543 U.S. 1121 (2005) (federal jurisdiction over outer Continental Shelf leaves no room for states to require licenses or permits for erection of structures on the seabed there). See also Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 448 Mass. at 48 (noting that area proposed for Wind Farm is located in federal waters, beyond the scope of jurisdiction of state agencies such as EFSB). Because state agencies have no jurisdiction over the Wind Farm, and no permitting responsibilities with respect thereto, this Court concluded that the Secretaiy was correct as a matter of law in limiting the scope of the FEIR to the environmental impact of the Cable Project. See Villages Develop. Co. v. Secretary of the Executive Office of Envtl. Affairs, 410 Mass. 100, 103, 111-12, 114 (1991); Boston Preservation Alliance, Inc. v. Secretary of Envtl. Affairs, 396 Mass. 489, 494 (1986).
*116 This Court further allowed the defendants’ motions to dismiss Count III of the First Amended Complaint as to the Alliance, concluding that they lacked standing to assert a claim under Chapter 231 A. However, this Court determined that the Town had standing to seek a declaratoiy judgment against the Secretary under Chapter 231 A. This Court dismissed for failure to state a claim upon which relief may be granted Count II of the First Amended Complaint, seeking mandamus, and Count V of the First Amended Complaint, a G.L.c. 214, §7A claim against the Secretary.
With respect to the Alliance’s standing under G.L.c. 214, §7A, this Court noted that harm to the environment is about to occur, triggering standing to challenge the adequacy of both the FEIR Certificate and the Section 61 findings, only when an agency, board, or department with regulatory control over a project issues its Section 61 findings to approve a permit authorizing the project. See Sierra Club v. Commissioner of the Dept. of Envtl. Mgmt., 439 Mass. 738, 745 (2003). This Court concluded that DFWs “no take’’ determination under MESA was not a final permit which triggered §7A standing because an administrative appeal of that determination was still pending before the agency.[4]
The Alliance sought to amend the complaint to add facts relating to EFSB’s final May 1, 2008 decision, which included Section 61 findings, arguing that the EFSB decision was a permit which triggered §7A standing. However, this Court denied the motion to amend as futile because pursuant to G.L. c. 164, §69P, the Supreme Judicial Court has exclusive jurisdiction over any appeal of an EFSB decision. This Court rejected the plaintiffs’s argument that a review of the FEIR could proceed in Superior Court independently of any review in the SJC of the Section 61 findings.
Nonetheless, this Court noted that “plaintiffs’ lack of standing is simply a matter of timing and not a fatal barrier to litigation.’’ Accordingly, this Court, in its discretion, ordered that Counts I and III of the First Amended Complaint be stayed until a state agency with permitting authority over the Project issued a permit and made Section 61 findings, triggering the right to judicial review under G.L.c. 214, §7A.
Thereafter, the Alliance moved to amend and supplement the complaint to add MHD and DEP as defendants and to include allegations that MHD issued an access permit for the Project on July 22, 2008 and DEP issued a Water Quality Certification on August 15, 2008. The plaintiffs argued that these permits triggered their right to challenge the FEIR under G.L.c. 30, §62H and G.L.c. 214, §7A. Although the MHD permit does not contain Section 61 findings, the DEP permit does include detailed Section 61 findings. In a Memorandum of Decision and Order dated December 17, 2008, this Court (Kane, J.) allowed the plaintiffs to so amend their complaint and lifted the stay, permitting this action to proceed.
EFSB Composite Certificate
Meanwhile, pursuant to the Cape Cod Commission Act, CWA was required to obtain the approval of CCC for the Project, which qualifies as a Development of Regional Impact (“DPI”), one which because of the magnitude of its impact on the natural or built environment, is likely to present issues affecting more than one municipality. See St. 1989, c. 716, §2(h). CCC must review such a project to determine whether it conforms to the regional policy plan and may approve the project if it is consistent with the regional policy plan, its probable benefit outweighs its probable detriment, it is consistent with municipal development ordinances, and it is consistent with any applicable municipal local comprehensive plans approved by CCC. See St. 1989, c. 716, §§12, 13. Pursuant to Section 13(e) of the Act, if CCC fails to approve a project, the project may not go forward. However, any party aggrieved by CCC’s decision may seek judicial review in the Barnstable Superior Court or Land Court. St. 1989, c. 716, §17(b). The reviewing court shall hear all evidence, determine the facts, and annul the decision if the Commission exceeded its authority. The Act provides that “(t]he foregoing remedy shall be exclusive.” St. 1989, c. 716, §17(d).
On October 18, 2007, CCC denied CWA’s application for the Cable Project, without prejudice, citing CWA’s failure to provide sufficient information for CCC to assess the impact of the project and its consistency with the regional policy plan. CWA did not, as set forth in the Act, appeal that decision to the Superior Court or Land Court. Instead, on November 21, 2007, CWA applied to EFSB for a certificate of environmental impact and public interest (“Composite Certificate”) for the Project pursuant to G.L.c. 164, §69K: “a composite of all individual permits, approvals or authorizations which would otherwise be necessary for the construction and operation of the facility.” G.L.c. 164, §69K. EFSB is authorized to issue a Composite Certificate when a facility “cannot be constructed due to any disapprovals, conditions or denials by a state or local agency or body . . .” G.L.c. 164, §69K. While the new EFSB proceeding was pending, the Town filed a separate Superior Court action seeking a declaratory judgment that a Composite Certificate could not supersede CCC’s disapproval of the Project. This Court (Rufo, J.) dismissed that action in a Memorandum of Decision and Order dated May 5, 2009, on the ground that the issue of EFSB’s jurisdiction vis á vis the Cape Cod Commission Act should be resolved by EFSB in the first instance, subject to a direct appeal to the SJC [25 Mass. L. Rptr. 375).
On May 27, 2009, EFSB issued a Composite Certificate for the Project which contains a DRI approval under the Cape Cod Commission Act, a Chapter 91 License ordinarily issued by DEP, the previously issued DEP Section 401 Water Quality Certification, a wetlands Order of Conditions under the Barnstable *117 Conservation Commission by-laws, a wetlands Order of Conditions under the Yarmouth Conservation Commission by-laws, a road opening permit ordinarily issued by the Barnstable Department of Public Works, a road opening permit ordinarily issued by the Yarmouth Department of Public Works, the previously issued MHD highway permit, and an Executive Office of Transportation and Public Works License Agreement. The Town and Alliance appealed the EFSB Composite Certificate to the SJC, which heard oral arguments on that matter on February 11, 2010.
Pending Motion on the MEPA Appeal
The Alliance now moves for judgment on the pleadings on Count I of the Second Amended and Supplemental Complaint, which alleges that the Secretary’s FEIR Certificate is arbitrary and capricious because the FEIR violates MEPA in several respects. In addition, the Town moves for judgment on the pleadings on Count III of the Second Amended and Supplemental Complaint, which seeks a declaratory judgment that the FEIR fails to comply with MEPA.[5]
DISCUSSION
The purpose of MEPA is to identify and mitigate the environmental effects of a project prior to its implementation by requiring that state agencies review and evaluate the environmental impact of all works, projects, or activities for which they are asked to issue a permit and use all practicable means to minimize environmental damage. See G.L.c. 30, §61; Allen v. Boston Redevelopment Auth., 450 Mass. 242, 246 (2007); Enos v. Secretary of Envtl. Affairs, 432 Mass. 132, 136 (2000). To effectuate this policy, MEPA established a process under which EIRs are prepared and submitted for review by interested agencies as well as public comment. Id. Final EIR determinations are placed in the hands of the Secretary, a disinterested public official with environmental expertise, in order to expedite environmental approvals. Enos v. Secretary of Envtl. Affairs, 432 Mass. at 137. The MEPA review process, which culminates with the Secretary’s certification of a final EIR, does not result in the approval or disapproval of a project, which ultimately is left to various permitting agencies. Town of Canton v. Commissioner of the Mass. Highway Dept., 455 Mass. 783, 785 (2010); Allen v. Boston Redevelopment Auth., 450 Mass. at 247. The certification signals only the Secretary’s determination that the information-gathering process has been completed in accordance with MEPA, allowing permitting agencies to use the information set forth in the EIR to assess the project’s impact on the environment and to prevent or minimize any consequential damage. Allen v. Boston Redevelopment Auth., 450 Mass. at 247. See Enos v. Secretary of Envtl. Affairs, 432 Mass. at 137 (Section 61 findings are MEPA’s principal enforcement component because permitting agency may not act without them).
The Secretary has broad discretion under MEPA to facilitate environmental planning for proposed projects that will require action by Commonwealth agencies. Allen v. Boston Redevelopment Auth., 450 Mass. at 254. Nonetheless, the process by which information is gathered, identified, and applied to MEPA’s statutory standards must be logical and not arbitrary or capricious. Allen v. Boston Redevelopment Auth., 450 Mass. at 254; Sierra Club v. Commissioner of the Dept. of Envtl. Mgmt., 439 Mass. at 749. Cf. Teamsters Joint Council No. 10 v. Director of Dept. of Labor and Workforce Dev., 447 Mass. 100, 106 (2006) (agency decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might deem proper to support it); Receiver of the Boston Hous. Auth. v. Commissioner of Labor & Indus., 396 Mass. 50, 58 (1985) (agency’s method of reaching conclusion must have rational foundation); Fieldstone Meadows Develop. Corp. v. Conservation Comm'n of Andover, 62 Mass.App.Ct. 265, 267 (2004) (decision is arbitrary and capricious if agency has acted for reasons that are extraneous to the statutory scheme based on some ad hoc agenda). Accordingly, judicial review focuses on whether the Secretary’s certification of a FEIR had a rational basis, giving appropriate deference to the Secretary’s expertise in environmental matters. Allen v. Boston Redevelopment Auth., 450 Mass. at 254.
I. MOOTNESS OF JUDICIAL REVIEW OF SECRETARY’S CERTIFICATION
The defendants contend that the Alliance’s claim for judicial review of the FEIR Certificate under G.L.c. 214, §7A and the Town’s claim for declaratory judgment have been mooted by the EFSB’s issuance of the May 27, 2009 Composite Certificate for the Project. Pursuant to G.L.c. 164, §69K, a composite certificate includes:
all individual permits, approvals or authorizations which would otherwise be necessary for the construction and operation of the facility and that portion of the certificate which relates to subject matters within the jurisdiction of a state or local agency shall be enforced by said agency under the other applicable laws of the commonwealth as if it had been directly granted by the said agency.
Now that CWA has received the Composite Certificate for the Project:
notwithstanding the provisions of any other law to the contrary . . ., no state agency or local government shall impose or enforce any law, ordinance, by-law, rule or regulation nor take any action nor fail to take any action which would delay or prevent the construction, operation or maintenance of such facility.
G.L.c. 164, §69K. See City Council of Agawam v. Energy Facilities Siting Bd., 437 Mass. 821, 828 (2002) (purpose of EFSB composite certificate is to ensure that local agencies do not use power over permits and licenses to thwart needs of broader community for reliable, affordable, and environmentally sound en *118 ergy supply). Thus, as of the date of the hearing in this matter, the Composite Certificate governs the Project.
The FEIR Certificate which the plaintiffs challenge in this lawsuit has no independent significance because it does not result in the approval or disapproval of the Project. See Town of Canton v. Commissioner of the Mass. Highway Dept., 455 Mass. at 785; Allen v. Boston Redevelopment Auth., 450 Mass. at 247. The importance of the FEIR Certifícate is that the FEIR and its supporting record provides the information on which state agencies and departments must rely in making permit decisions for the Project. See Allen v. Boston Redevelopment Auth., 450 Mass. at 247; Enos v. Secretary of Envtl. Affairs, 432 Mass. at 137. Accordingly, in attacking the Secretary’s certification as arbitrary and capricious, the plaintiffs request that this Court vacate the FEIR Certificate and stay all state permits and Section 61 findings that rely upon the FEIR. However, the Composite Certificate in effect supercedes any permits or licenses issued by state agencies in reliance on the FEIR. Thus, even if this Court were to conclude that the Secretary’s certification is arbitrary and capricious, the relief sought in this action would not have the legal effect desired by the plaintiffs: to halt the Project.
The duty of the court is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions. Jefferson Constr. Corp. v. Commonwealth, 386 Mass. 142, 143 (1982). The general rule is that courts normally do not decide moot cases, in part because judicial economy requires that insubstantial controversies not be litigated. In the Matter of Sturtz, 410 Mass. 58, 59-60 (1991); Lockhart v. Attorney Gen., 390 Mass. 780, 783 (1984). When, pending an appeal from a judgment, an event occurs which renders it impossible for the court to grant the plaintiff any effectual relief whatsoever, the court should dismiss the appeal rather than proceed to a formal judgment. Caputo v. Board of App. of Somerville, 330 Mass. 107, 111 (1953). Cf. Carrington v. Commonwealth, 455 Mass. 1014, 1015 (2009) (claim is moot when specific relief requested by petitioner is no longer available); Reilly v. School Comm. of Boston, 362 Mass. 689, 695 (1972) (declaratory relief claim may become moot due to changed circumstances).
Here, the plaintiffs’s claims for judicial review of the FEIR Certificate appear to be moot because EFSB’s Composite Certificate supercedes the permits issued in reliance on the FEIR. Invalidation of the Secretary’s certification that the FEIR adequately complies with MEPA has no legal or practical effect on the Project, which is now governed by the Composite Certificate. In granting the Composite Certificate, EFSB did not rely on the Secretary’s FEIR Certificate but rather, conducted its own analysis of the environmental impact of the Project, adopting the findings it made in the May 2005 decision upheld by the SJC.[6] At this time, the plaintiffs’s primary avenue of relief is their pending appeal of the Composite Certificate to the SJC pursuant to G.L.c. 164, §69P. Thus, the Second Amended and Supplemental Complaint arguably is subject to dismissal as moot. Cf. DeGrace v. Conservation Comm’n of Harwich, 31 Mass.App.Ct. 132, 137, rev. den., 411 Mass. 1105 (1991) (once DEP issued superceding order of conditions for project under Wetlands Protection Act, appeal from town conservation commission’s denial of permit was moot and should have been dismissed).
Nonetheless, this Court is cognizant of the substantial delays already experienced by both sides in obtaining judicial resolution of the legality of the Project. It is unclear when the SJC will rule on the validity of the EFSB Composite Certificate, and the likely outcome of the plaintiffs’s appeal in that forum is uncertain. In the event that the SJC invalidates the Composite Certificate, the state permits and licenses issued in reliance on the FEIR might once again govern the Project, breathing new life into the plain tiffs’s MEPA appeal. This Court declines to stay this action pending the outcome of the SJC appeal because considerations of judicial economy and the public interest militate against further delay. Accordingly, despite the potential mootness of this action, this Court will address the merits of the plaintiffs’s MEPA challenge, which has been fully briefed by the parties.
Ü. SUBSTANTIVE REVIEW OF FEIR CERTIFICATE
The Alliance and Town argue that the FEIR Certificate is arbitrary and capricious for numerous reasons.
A. DISAGGREGATION OF BENEFITS AND IMPACTS OF WTGs
The Alliance and Town contend that the Secretary acted arbitrarily and capriciously in discussing the benefits of the WTGs, renewable energy and improved air quality, while irrationally refusing to consider the environmental harm caused by the WTGs. The Secretary’s failure to analyze the impacts of the Wind Farm was rationally based on a legally correct determination that MEPA jurisdiction over the Project does not extend into federal waters. When a project is subj ect to MEPA review because of its need for a permit from a state agency, the scope of the FEIR must be limited to the part of the project that is within the subject matter jurisdiction of the permit. G.L.c. 30, §62A; Villages Dev. Co. v. Secretarty of the Executive Office of Envtl. Affairs, 410 Mass. at 102, 111. The subject matter of a permit means the scope of what an agency may consider when making a decision to grant the permit. Id. at 112. It is undisputed that Horseshoe Shoals in Nantucket Sound, the proposed location of the Wind Farm, lies outside Massachusetts’ three-mile territorial jurisdiction and within the federal government’s exclusive jurisdiction over the Outer Continental shelf. See Ten Taxpayer Citizens Group v. Cape Wind Assocs., 373 F.3d at 196-97 (federal juris *119 diction over outer Continental Shelf leaves no room for states to require licenses or permits for erection of structures on the seabed there). See also Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 448 Mass. at 48 (noting that area proposed for wind farm is located in federal waters, beyond the scope of jurisdiction of state agencies such as EFSB). Thus, the Secretary properly declined to analyze the impacts of the Wind Farm, which is within the federal government’s exclusive jurisdiction.
The Secretary’s references to the benefits of the Wind Farm, notwithstanding MEPA’s jurisdictional limitations, were not irrational or illogical. Inclusion in the FEIR and Certificate of information about the benefits, impacts, and proposed mitigation measures with respect to the Wind Farm was a remnant of the initial stages of the process in which CWA agreed to proceed jointly with MEPA and NEPA review. Once those reviews were severed, the Secretary made clear that any discussion of the Wind Farm in the FEIR and Certificate was informational only, to enlighten the public and inform state agencies entitled to comment on Wind Farm impacts in the course of MMS’s proceedings and CZM’s federal consistency review. Thus, the Secretary’s discussion of the benefits of and proposed mitigation for the Wind Farm, coupled with adherence to jurisdictional limitations which preclude MEPA regulation of Wind Farm impacts, was rational, logical, and related to statutory concerns, not arbitrary and capricious. See Allen v. Boston Redevelopment Auth., 450 Mass. at 254; Sierra Club v. Commissioner of the Dept. of Envtl. Mamt., 439 Mass. at 749.[7] Nor was it arbitrary and capricious for the Secretary to certify the adequacy of the FEIR on the basis that certain legal determinations and additional necessary information could be obtained through the NEPA process. The Secretary thoroughly analyzed the impacts and proposed mitigation of the Cable Project within his jurisdiction and certified MEPA compliance on that basis.
B. CHAPTER 91 DETERMINATION
The Alliance further contends that the FEIR Certificate is arbitrary and capricious because the Secretary irrationally determined that the Cable Project cannot reasonably be located or operated away from tidal waters and is thus a water dependent infrastructure crossing facility under Chapter 91 and DEP regulations. The Secretary found that if the Federal government permits the Wind Farm to be located in the federal waters of Nantucket Sound, there is no reasonable alternative to the cables traversing tidelands subject to Chapter 91. Such a finding appears to be within the Secretary’s broad discretion. See Allen v. Boston Redevelopment Auth., 450 Mass. at 254 (court must give appropriate deference to Secretary’s expertise in environmental matters). Cf. Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 448 Mass. at 52-54 (it was proper for EFSB to make conditional finding that there will be need for Cable Project if federal government approves Wind Farm).
In any event, the plaintiffs’s challenge to this determination has been mooted by a regulation change enacted after the completion of MEPA review. On October 3, 2008, DEP amended its regulations by adding “(i]nfrastructure facilities used to deliver electricity, natural gas or telecommunications services to the public from an offshore facility located outside the Commonwealth” to the list of industrial uses that are categorically “water-dependent” under 310 Code Mass. Regs. §9.12(2)(b). Because the Cable Project is automatically water-dependent under the now-operative regulations, it is irrelevant whether the Secretary’s finding of water-dependency was arbitrary and capricious. The EFSB Composite Certificate includes a Chapter 91 license based on the amended regulation, and a determination by this Court that the Secretary erred in his determination of water dependency would have no effect on that license, rendering the Alliance’s claim in this action moot.[8]
C. INADEQUATE IMPACT ANALYSIS
The Alliance next argues that the Secretary’s certification was arbitrary and capricious because the FEIR fails to contain an adequate analysis of the no-build alternative and alternative locations for a wind facility, as directed by the DEIR Certificate. See Allen v. Boston Redevelopment Auth., 450 Mass. at 259 (Secretary has discretion to specifically decide what project alternatives are appropriate for inclusion in particular FEIR, and those reasonable alternatives will vary depending on nature of project). The Alliance also contends that the FEIR Certificate is arbitrary and capricious because the FEIR fails to provide additional analysis required by the Secretary in the DEIR Certificate with respect to fisheries impacts, oil spills, navigation, air quality, decommissioning, and general water quality. Cf. id. at 259 (Secretary’s certification was arbitrary and capricious where Secretary directed FEIR to consider reasonable alternative locations for Level 4 bio safety lab and FEIR did not address this issue).[9]
However, all of these impact issues relate to the Wind Farm, which as discussed supra, lies outside MEPA’s jurisdiction. As recognized by the Secretary in the ENF, the DEIR, the FEIR, and the FEIR Certificate, none of the impacts raised by the Alliance can be regulated by the state agencies issuing permits for the Project. By order dated June 17, 2008, and affirmed by order dated December 17, 2008, this Court (Kane, J.) dismissed so much of the Alliance’s G.L.c. 214, §7A claim and so much of the Town’s declaratory judgment claim as sought to challenge the FEIR and Certificate based on the Secretary’s determination that he lacked jurisdiction over the Wind Farm. Accordingly, the plaintiffs’s arguments concerning the inadequacy of the FEIR with respect to alternative locations for the Wind Farm, fisheries impacts, oil spills, navigation, air *120 quality, decommissioning, and general water quality are no longer viable in this action and do not constitute a basis for invalidating the Secretary’s action as arbitrary and capricious. The Town’s claims that the FEIR Certificate is arbitrary and capricious because the FEIR inadequately addresses the risk of oil spills, the FAA presumed hazard determination, and marine surface radar interference similarly relate to the impacts of the Wind Farm in federal waters, and are not viable in this action.
D. JET-PLOWING IMPACTS
Finally, the Alliance contends that the Secretary’s certification is arbitrary and capricious because the FIER does not adequately address the water quality impacts of the jet plowing activities needed to embed the submarine cables. This claim relates solely to the Cable Project and is within the Secretary’s MEPA jurisdiction. Nonetheless, a review of the record reveals that there is a rational basis for the Secretary’s conclusion that the FEIR adequately describes the water qualify, benthic, and shellfish impacts of jet plowing and proposes appropriate mitigation measures. See Allen v. Boston Redevelopment Auth., 450 Mass. at 254 (court must give appropriate deference to Secretary’s expertise in environmental matters). Cf. Teamsters Joint Council No. 10 v. Director of Dept. of Labor and Workforce Dev., 447 Mass. at 106 (decision is arbitrary and capricious only when it lacks any rational explanation that reasonable persons might deem proper to support it). The Secretary noted that although jet plowing is the preferred installation technology, it nonetheless produces impacts requiring mitigation. He then discussed the various impacts and required certain measures to minimize those impacts. The Secretary concluded that the Cable Project will have no long-term water quality impacts, and noted that CWA would have to further address temporary water quality impacts in seeking a Section 401 Water Quality Certification from DEP.[10] The Secretary’s analysis and conclusions in the FEIR Certificate with respect to jet plowing are logical and rational, not arbitrary and capricious. See Allen v. Boston Redevelopment Auth., 450 Mass. at 254.
Thus, the Alliance and the Town have not met their difficult burden of demonstrating that the Secretary acted arbitrarily and capriciously in certifying that the FEIR adequately and properly complies with MEPA with respect to the portion of the Project within MEPA jurisdiction: the Cable Project. This Court firmly believes the plaintiffs’s legitimate concerns with respect to the impacts of the Wind Farm must be addressed in the context of the federal NEPA review and permitting process.
ORDER
For the foregoing reasons, it is hereby ORDERED that the Alliance’s Motion for Judgment on the Pleadings pursuant to Mass.R.Civ.P. 12(c) and Superior Court Standing Order 1-96 be DENIED and that the Town of Barnstable’s Motion for Judgment on the Pleadings be DENIED. It is DECLARED and ADJUDGED that the Secretary’s March 29, 2007 FEIR Certificate on the Cape Wind Project was not arbitrary and capricious. It is hereby ORDERED that the plaintiffs’s Second Amended and Supplemental Complaint be DISMISSED in its entirety in accordance with this order and the Court’s prior orders of June 17, 2008 and December 17, 2008.

 Notably, EFSB is the only state agency which may render its permitting decision prior to the conclusion of the MEPA process. See G.L.c. 164, §69K (EFSB may consider petition for composite certificate when local permits are unduly delayed by EIR process); G.L.c. 164, §690 (EFSB not bound by MEPA to extent its requirements would prevent Board from issuing Certificate within 6 months of petition).

 On July 2, 2008, DFW dismissed the plaintiffs’s appeal for lack of jurisdiction, concluding that it could not apply MESA to the portion of the project in federal waters. The plaintiffs are no longer pursuing a MESA claim.

 As discussed supra, prior orders of this Court dismissed the plaintiffs’s challenge to the adequacy of the FEIR based on the Secretary’s failure to require analysis of various environmental impacts from the Wind Farm located in federal waters, and that challenge is no longer a viable claim in this case.

 As noted supra, EFSB is the only state agency which may render its permitting decision prior to the conclusion of the MEPA process. See G.L.c. 164, §69K (EFSB may consider petition for composite certificate when local permits are unduly delayed by EIR process); G.L.c. 164, §690 (EFSB not bound by MEPA to extent its requirements would prevent Board from issuing Certificate within 6 months of petition).

 Similarly, there is no merit to the Town’s argument that the Secretary illogically split the Project into disparate parts by treating the Cable Project separately from the Wind Farm. The Secretary’s treatment of the Wind Farm was jurisdiction-ally compelled. Moreover, the MEPA policy prohibiting segmentation of a project by a developer into different components in order to evade environmental review does not apply when the Secretary obtains jurisdiction over a project through the granting of a permit by a state agency. Villages Dev. Co. v. Secretary of the Executive Office of Envtl. Affairs, 410 Mass. at 114.

 The water dependency issue will ultimately be resolved by the SJC, as the plaintiffs’s appeal of the Composite Certificate includes a claim that DEP ‘s amended regulation improperly conflicts with Chapter 91.

 As noted supra, the Secretary issued the DEIR Certificate under the assumption that CWA would proceed with joint MEPA/NEPA review of the Project. Shortly thereafter, however, MMS replaced the U.S. Army Corps of Engineers as the lead federal agency, and MMS ordered CWA to begin the Draft EIS process anew.

 Indeed, EFSB’s Composite Certificate includes a Section 401 Water Quality Certification imposing specific requirements on the Cable Project to protect water quality.